IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMPRO COMPUTERS, INC., a California corporation,

    Plaintiff,

v.

LXE, LLC, a Delaware limited liability company, METROLOGIC INSTRUMENTS, INC. d/b/a HONEYWELL SCANNING AND MOBILITY, a New Jersey Corporation, and DOES 1-10, inclusive,

    Defendants.

C.A. No. 13-1937-LPS

Chase T. Brockstedt, BAIRD MANDALAS BROCKSTEDT, LLC, Lewes, DE

Thomas M. Dunlap, Tye Bell, DUNLAP WEAVER, PLLC, Washington, DC

Jason B. Witten, WITTEN LAW, LTD, London, UK

    Attorneys for Plaintiff.

Brian M. Rostocki, REED SMITH LLP, Wilmington, DE

John F. Hagan, Jr., REED SMITH LLP, Chicago, IL

John C. Scalzo, REED SMITH LLP, New York, NY

    Attorneys for Defendants.

**MEMORANDUM OPINION**

September 9, 2015
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court is the Partial Motion to Dismiss Plaintiff's Amended Complaint filed by Defendants LXE, LLC ("LXE") and Metrologic Instruments, Inc. ("Metrologic" and, together with LXE, "Defendants"). (D.I. 41)

## I. BACKGROUND

LXE contracted with Ampro Computers, Inc. ("Ampro" or "Plaintiff")[1] to design and manufacture a custom product called a "Carrier Board" and related products for the VX8/9c rugged vehicle-mounted computer, memorializing the parties' agreement in two contracts (the "Development Agreement" and the "Manufacturing Agreement") and in a statement of work ("SOW"). (D.I. 42 at 4; D.I. 33 ¶ 29) The SOW was signed on or about October 15, 2012 and stated some of the details necessary for the design of the Carrier Board. (D.I. 33 ¶¶ 32-33) The Development Agreement was signed the same day. (D.I. 33 ¶ 34)

The parties later executed several separate addendums, including the International Manufacturing and Purchasing Agreement (the "IMPA"), the Product and Prices Addendum to the International Manufacturing and Purchasing Agreement (the "PPA"), and the Requirements Addendum to the IMPA (the "RA"), all of which are dated on or about January 29, 2013. (D.I. 33 ¶¶ 35-36) Also pertinent to Plaintiff's allegations is a Development Services Agreement ("DSA"). (D.I. 33 ¶ 12)

On November 19, 2013, Plaintiff filed its original complaint, alleging breach of the Development Agreement and the Manufacturing Agreement. (D.I. 1) Defendants moved to

---

[1] Some of the documents in the record refer to "ADLINK Technology Inc." (*See, e.g.,* D.I. 33-2)

1

dismiss the original complaint. (D.I. 12) On June 27, 2014, following oral argument, the Court granted Defendants' motion to dismiss without prejudice to Plaintiff's opportunity to file an amended complaint. (D.I. 28; *see also* D.I. 31 ("Tr.")) In ruling from the bench at the conclusion of the motions hearing, the Court stated that there were "real problems" with the original complaint, elaborating: "It does not adequately identify provisions in the contract that are alleged to be breached. Generally, it is too conclusory, and it is devoid of specific factual allegations that are usually, if not always, required" to state a claim for relief. (Tr. at 59-60) The actual contracts between the parties were also not included with the original complaint, despite Plaintiff's claims being based on them. (*See id.* at 61)

On July 31, 2014, Plaintiff filed an amended complaint (D.I. 33), which Defendants moved to dismiss (D.I. 41). The amended complaint asserts a claim for breach of contract against all defendants, and in the alternative a claim for tortious interference with contract against Defendant Honeywell Scanning and Mobility ("HSM") as well as a claim for quantum meruit against all defendants. (*See* D.I. 33)

According to Defendants, the pertinent corporate structure is as follows:

> On April 28, 2008 Honeywell International Inc. ("Honeywell") acquired Metrologic, a leading manufacturer of data capture and collection hardware and software. Metrologic is a wholly owned subsidiary of Honeywell and . . . is one of several Honeywell subsidiaries that does business under the name "Honeywell Scanning & Mobility."

(D.I. 42 at 2) (internal citations omitted)

Plaintiff's amended complaint alleges that, "[a]s is seen in Sections 2(a), 8(d), [and] 21(a) of the IMPA, the PPA, the RA, and the SOW, the IMPA is a requirements contract whereby

Ampro was the exclusive manufacturer of the Carrier Boards, and Defendants were to purchase all of their requirements of the Carrier Boards from Ampro." (D.I. 33 ¶ 39) The amended complaint also references forecasts from LXE which "represented that their minimum requirements were at least 20,000 units of the Carrier Boards over three (3) years." (D.I. 33 ¶ 40) In particular, Plaintiff alleges:

> Failure to meet the 20,000 unit requirement would result in . . . penalties of an increased cost per unit (Section 7), loss of credit terms (Section 12), loss of rights in intellectual property (Section 20 (c&d)), loss of the right to manufacture the Carrier Boards after purchase of the first 20,000 units (Section 21(b)), and Defendants would have to pay for the intellectual property escrow account maintenance (Section 21(c)(3)). Similarly, if Ampro failed to meet Defendants' 20,000 unit requirement it would be liable to Defendants for the shortfall and could lose the exclusive right to manufacture the Carrier Boards (Section 21(c)).

(D.I. 33 ¶ 43)

Plaintiff's amended complaint goes on to allege that Ampro performed all duties required of it under the Agreement, and identifies delays caused by Defendants. (D.I. 33 ¶ 45) It continues by alleging that on July 10, 2013, "Defendant HSM's Richard Mayda requested via email to Ampro to terminate the Agreements on the grounds that Defendants would not be able to bring the products to market on time and price issues." (D.I. 33 ¶ 47) Plaintiff alleges that this "wrongful termination"[2] was in breach of the DSA, IMPA, and their related addendums and schedules, proximately causing millions of dollars of damages to Ampro.

---

[2]The wrongful termination claim stems from Section 9(b) of the DSA which provides Defendants a "unilateral right to terminate the DSA if [but only if] Ampro's delay in performance was not caused by Defendants." (D.I. 33 ¶ 51) Plaintiff has alleged that any delays were caused by Defendants and, therefore, Defendants did not have grounds to unilaterally terminate the contract under Section 9(b). (*Id.*)

More particularly, Plaintiff alleges the following breaches by Defendants:

- Section 9(b) of the DSA. Defendants had a unilateral right to terminate the DSA if, but only if, Ampro's delay in performance was not caused by Defendants. However, Plaintiff Ampro did not cause any delay in performance. Any allegation of delay by Defendants was caused by Defendants and not Ampro. Therefore, Defendants did not have grounds to unilaterally terminate under Section 9(b).

- Section 1 of the DSA and Section 7.0 of the SOW. Defendants failed to perform their duties in that they failed to timely provide performance of these duties, and then with their wrongful termination, ceased performance of these duties all together.

- Section 2 of the DSA, and Section 9 of the SOW. Defendants have failed to pay $226,829 owed under these Sections.

- Sections 3, 7, 8(a, d & e), 16(a) [and] 21(a), [of] the PPA, the RA, and the IMPA. Defendants have failed to forecast, order, and pay for any of their requirements of the Carrier Board, Ampro's related standard products such as the COM Express module, accessories and spare parts.

- Section 25(a) of the IMPA. Defendants have failed to cure their breach of the IMPA within thirty (30) days notice from Ampro.

(*Id.* ¶ 51)

Importantly, there are no allegations that Defendants ever purchased or sought to purchase the Carrier Boards elsewhere, or took any steps to fulfill their requirements from any source other than Plaintiff.

## II. LEGAL STANDARDS

When presented with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts conduct a two-part analysis. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.

4

2009). First, courts separate the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210-11. This first step requires courts to draw all reasonable inferences in favor of the non-moving party. *See Maio v. Aetna, Inc.*, 221 F.3d 472, 500 (3d Cir. 2000).

However, the Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

Second, courts determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This is a context-specific determination, requiring the court "to draw on its judicial experience and common sense." *Id.* at 679. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotation marks omitted). Finally, although a non-fraud claim

5

need not be pled with particularity or specificity, that claim must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* at 555.

## III. DISCUSSION

### A. Breach of Contract

A breach of contract claim requires: (1) the existence of a contract, (2) the breach of an obligation imposed by that contract, and (3) resulting damages to the claimant. *See VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del. 2003). Here, the existence of a contract is undisputed. (*See* D.I. 33 Exs. B-E) At issue is whether Plaintiff has adequately alleged a breach of any obligation imposed by any of the parties' contracts and whether Plaintiff was damaged by any breach. The Court concludes that the amended complaint fails to adequately allege either a breach or resulting damages.

#### 1. None of the contracts includes a minimum purchase requirement

Plaintiff's amended complaint lists several contractual provisions it believes Defendants breached in connection with "wrongfully terminating" the parties' contractual relationship. (*See, e.g.,* D.I. 33 ¶ 51)[3] All of Plaintiff's allegations essentially rely on two contentions: (i) that the

---

[3]For example, Plaintiff alleges that Defendants breached Section 9(b) of the DSA by "unilaterally terminat[ing]" the parties' contract, without grounds to do so. (D.I. 33 ¶ 51) Section 9(b) of the DSA is a termination provision, stating in pertinent part, "LXE may terminate this Agreement at any time . . . if ADLINK fails to perform the Work under the Agreement within the time specified in this Agreement or any extension as long as the delay is not caused by LXE." (D.I. 33 Ex. C at 4) It is undisputed that Defendant contacted Ampro to terminate the Agreements in July 2013. (D.I. 33 ¶ 47) Further, the Court must take as true the amended complaint's allegations that any delays up until that point "were not attributable to Ampro." (*Id.* ¶ 48)

Similarly, Plaintiff alleges a breach of Section 1 of the DSA and Section 7.0 of the SOW, which govern various design, verification, and validation responsibilities of Honeywell and LXE prior to ADLINK's actual manufacturing of the carrier board product. (*See* D.I. 33 ¶ 51; D.I. 33

6

parties' agreements constitute a "requirements contract," obligating Defendants to purchase all of their required Carrier Boards from Plaintiff; and (ii) that the parties' agreement further includes a minimum purchase requirement, requiring Defendants to purchase at least 20,000 Carrier Boards from Plaintiff. While the Court agrees with Plaintiff as to the first contention, it disagrees with Plaintiff as to the second. (*See generally* Tr. at 49) (defense counsel stating: "[I]f you have a requirements contract, that doesn't mean you have a minimum purchase obligation. Those are two distinct things.")[4]

Plaintiff is correct that Defendants agreed through the parties' various contracts that Defendants would purchase all of their requirements for Carrier Boards from Plaintiff. As correctly stated by Ampro, a requirements contract is "a contract in which the buyer expressly agrees to buy all of the buyer's requirements of a stated item exclusively from the seller who agrees to sell that amount to the buyer." (D.I. 46 at 4) (citing Del. UCC § 2-306(a)) Ampro has adequately pled that the parties had a requirements contract. (*See, e.g.*, D.I 33 ¶ 39; D.I. 33 Ex. D

---

Ex. B at 7; D.I. 33 Ex. C at 1) With respect to Sections 3, 7, 8(a, d & e), 16(a), and 21(a), of the PPA, RA, and IMPA, Plaintiff generally alleges, "Defendants have failed to forecast, order and pay for any of their requirements of the Carrier Board, Ampro's related standard products such as the COM Express module, accessories and spare parts." (D.I. 33 ¶ 51)

For purposes of the Court's analysis of the pending motion, the differences among the specific alleged contractual violations are not material. All of the alleged breaches that are the subject of the motion depend on there being a minimum purchase requirement somehow imposed on Defendants. As the Court concludes that none of the contracts imposes such an obligation on Defendants, Plaintiff has failed to adequately allege a breach of any of the contracts.

[4]*See also Orchard Grp. v. Konica Med. Corp.*, 135 F.3d 421, 428 (6th Cir. 1998) ("A requirements contract is a contract which calls for one party to furnish materials or goods to another party to the extent of the latter's requirements in business."); *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.*, 130 F.2d 471, 473 (3d Cir. 1942) ("[T]he buyer in a requirements contract has no duty to have any requirements . . . .").

¶ 21 ("ADLINK's right to Manufacture. ADLINK shall have the right to manufacture for LXE at least the first 20,000 units of the Carrier Card within three (3) years of the Effective Date."); D.I. 46 at 4)

However, Plaintiff is incorrect when it contends that the contracts impose a minimum purchase requirement on Defendants.[5] Specifically, Plaintiff argues that Defendants were contractually obligated to purchase at least 20,000 Carrier Boards from Plaintiff.

Ampro identifies no provision in any of the parties' contracts that expressly requires Defendants to purchase any Carrier Boards from Plaintiff in the event that Defendants have no requirements for such Carrier Boards. Instead, Plaintiff relies on implications from various provisions that anticipated that Defendants would have such requirements, likely for at least 20,000 units. None of these provisions, however, singly or collectively, makes out a contractual obligation for Defendants to purchase Carrier Boards from Ampro if Defendants turn out not to have a requirement for any Carrier Boards.

For instance, pursuant to the IMPA, "LXE *will* provide forecast and Orders to ADLINK for accessories and spare parts" (D.I. 33 Ex. D ¶ 16(a)) (emphasis added), but "Order" is defined in the agreements as "a purchase order . . . that LXE *may* deliver to ADLINK for the purchase of Product under this Agreement" (D.I. 33 Ex. D ¶ 1(e)) (emphasis added). Accordingly, LXE

---

[5]In connection with Defendants' efforts to dismiss Plaintiff's original complaint, Ampro expressly contended that the contracts among the parties included a minimum purchase requirement. (*See, e.g.*, Tr. at 35) Now, Ampro has backed away from such an express allegation. (*See, e.g.*, D.I. 46 at 1) ("[N]owhere in the [amended complaint] is the Manufacturing Agreement [pled] as a minimum purchase agreement.") However, in the Court's view, Ampro's claims still rely on Ampro's interpretation of the contracts as including a minimum purchase requirement. (*See, e.g., id.* at 2) ("Defendants did *not* have the discretion to not purchase any products under the Manufacturing Agreement.") No other plausible basis for a breach of contract is alleged in the amended complaint.

"may" submit an order, but is not required to do so.

The IMPA includes provisions which contemplate the very possibility that Defendants' needs may deviate from what Defendants forecast. These provisions indicate that while the 20,000 unit figure was a threshold for favorable bulk pricing, they do not establish a contractual obligation for Defendants to purchase at least this number of units. For example, paragraph 7 of the IMPA provides:

> Prices for the Custom Products are based on LXE's purchase of at least 20,000 units of the Carrier Card from ADLINK within three (3) years of the Effective Date. For the avoidance of doubt, ADLINK must be the manufacturer of these 20,000 units of the Carrier Card. ADLINK retains the right to increase the price of the Custom Products if LXE fails to purchase 20,000 of the Carrier Card from ADLINK . . . .

Similarly, paragraph 8(e) of the IMPA states:

> In the event LXE materially deviates from its forecast . . . the parties will meet to discuss reimbursement to ADLINK of its reasonable costs incurred complying with LXE's forecast and Buffer Stock requirements.

Even the description of Defendants' obligation to provide forecasts of its likely requirements, and the reason for such forecasts, demonstrates that the parties did not intend in the contract actually to require Defendants to purchase any particular amount of Carrier Boards from Plaintiff. Paragraph 8(a) of the IMPA states:

> The purpose of the forecast is to provide ADLINK with reasonable projections of LXE's future order requirements of Product to allow ADLINK to schedule its factory and order components necessary for the manufacture of the Product. The forecast may fluctuate in response to changes from LXE sales and is not to be construed as an LXE commitment.

Ampro further alleges:

9

> As set forth in multiple Sections of the IMPA, Defendants
> represented that their minimum requirements were at least 20,000
> units of the Carrier Boards over three (3) years, broken out in
> Section 7 as 5,000 units the first year, 7,000 units the second year,
> and 8,000 units the third year.

(D.I. 33 ¶ 40)

Ampro's assumptions that Defendants would purchase 20,000 units pervades its allegations, and is repeatedly referred to as a 20,000 unit "requirement." (*See* D.I. 33 ¶¶ 40, 42-43)

> Failure to meet the 20,000 unit requirement would result in . . .
> penalties of an increased cost per unit (Section 7), loss of credit
> terms (Section 12), loss of rights in intellectual property (Section
> 20(c & d)), loss of the right to manufacture the Carrier Boards after
> purchase of the first 20,000 units (Section 21(b)), and Defendants
> would have to pay for the intellectual property escrow account
> maintenance (Section 21(c)(3)).

(*Id.* ¶ 43) Again, however, the contracts do not impose an obligation on Defendants to purchase any number of Carrier Boards from Plaintiff if it so happens that Defendants have no such requirements.

As it turns out, according to the amended complaint, Defendants did not have any requirements for the Carrier Boards, since Defendants found they could not get their product to market on time. (*See* D.I. 33 ¶ 47) The amended complaint nowhere alleges that Defendants fulfilled their requirements for Carrier Boards from anyone other than Plaintiff. Thus, Plaintiff has failed to allege a breach of a contractual obligation by Defendant and, therefore, has failed to state a claim on which relief may be granted.

### 2. Plaintiff fails adequately to allege damages resulting from a breach

Plaintiff's alleged damages all flow from Defendants' failure to purchase any Carrier

Boards from Plaintiff. (*See, e.g.*, D.I. 33 ¶ 52 ("Defendants' breach of the DSA and IMPA was the direct and proximate cause of damage to Plaintiff Ampro in an amount to be proven [at] trial, but which is estimated at more than $130,000,000 including $246,829 arising from the DSA, and failure to purchase Defendants' requirement of Carrier Boards and standard products arising from the IMPA, plus interest, attorneys' fees and costs."); *id.* ¶ 39 ("Sections 2(a), 8(d), 21(a) of the IMPA, the PPA, the RA and the SOW, the IMPA is a requirements contract whereby Ampro was the exclusive manufacturer of the Carrier Boards, and Defendants were to purchase all of their requirements of the Carrier Boards from Ampro."))

Given the Court's conclusion that Defendants had no contractual obligation to purchase any number of Carrier Boards from Plaintiff – if, as alleged, it turned out that Defendants had no requirement for any such Carrier Boards, and did not purchase them from anyone else – it follows that any theory of damages based on a failure to purchase at least 20,000 units from Plaintiff must fail. Thus, Plaintiff has failed to allege the damage element of its breach of contract claim and has failed to state a claim on which relief may be granted.[6]

### B. Is HSM a Party to the Contracts?

Given the Court's conclusions about the inadequacies in Plaintiff's pleadings, it is unclear whether the Court need also address the parties' dispute as to whether Defendant HSM should be treated as a party to the contracts. However, the parties have devoted a significant amount of

---

[6]In light of the Court's determinations in this Memorandum Opinion, it appears that the only remaining claim for breach of contract is Plaintiff's claim for approximately $226,829 allegedly owed by Defendants under Section 2 of the DSA and Section 9 of the SOW. (D.I. 33 ¶ 51) It appears that Plaintiff's request for an award of interest, attorneys' fees, and costs may also survive today's ruling. (*See id.* ¶ 52) The Court will, by separate order, direct the parties to advise the Court of their position(s) as to what, if any, claims remain to be litigated and how the Court should proceed.

11

briefing to this issue, so the Court will resolve it.

Plaintiff has alleged numerous facts as to HSM's relationship with LXE, including facts about the merger/acquisition, signatures of HSM employees on the pertinent contracts, and representations made to Ampro and to the general public about ownership. (*See* D.I. 33 ¶¶ 6-25) For example, Plaintiff alleges that the SOW was signed by an HSM employee and that "when Defendant HSM's John Adams signed the SOW on behalf of Defendant HSM[,] Defendants were intending to, and did, bind Defendant LXE and Defendant HSM[] as an additional party to the SOW." (D.I. 33 ¶ 32) Taking these allegations as true, Ampro has adequately pled that HSM is a party to the agreements.

However, the Court does not agree with Plaintiff that it has also adequately alleged that HSM operated LXE as its alter ego. (*See* D.I. 33 ¶ 34) "[I]n order to state a claim for piercing the corporate veil under an alter ego theory, [Plaintiff] must show (1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present." *Trevino v. Merscorp, Inc.*, 583 F.Supp.2d 521, 528 (D. Del. 2008). In determining whether a "single economic entity" exists between entities, factors to consider are: (1) undercapitalization; (2) failure to observe the corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders. *See United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981). While Plaintiff has alleged the presence of some of these factors – failure to observe corporate formalities and using LXE as a facade (*see* D.I. 33 ¶¶ 19-23) – the allegations with respect to other factors are merely

12

conclusory (*see, e.g., id.* ¶ 20) (alleging HSM "uses Defendant LXE as a vehicle for fraud and injustice – a blind from which to operate Defendant HSM without liability or consequence") and, on the whole, inadequate.

### C. Tortious Interference with Contract

While not entirely clear in the original complaint, the amended complaint makes clear that Plaintiff's claim for tortious interference with contract is pled in the alternative. Plaintiff alleges that "in the event Defendant HSM is found to be a party to one or more of the Agreements, then this Claim will not be pursued as to that Agreement(s)." (D.I. 33 ¶ 53) As the Court has concluded that HSM is to be treated as a party to the contracts, Plaintiff's claim for tortious interference will be dismissed.

### D. Quantum Meruit

This claim is also clearly pled in the alternative. Plaintiff states, "[i]f one or more of the Agreements is found to be binding to one or more of the Defendants, then this claim will not be pursued as to that Defendant(s) and that Agreement(s) to which that Defendant(s) is bound." (D.I. 33 ¶ 59) The Court has concluded that the various contracts are binding as to the various Defendants (although it has also found that the contracts do not mean what Plaintiff argues they mean). Thus, Plaintiff's claim for quantum meruit will be dismissed.

### E. Request for Leave

In its brief, Plaintiff "expressly reserves the right to amend." (D.I. 46 at 20) The Court denies Plaintiff's request for leave to file yet another amended complaint as such an amendment would be futile. *See Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 291 (3d Cir. 1988) (explaining that futility is proper basis for denial of request for leave to amend). No amended

13

pleading could alter the contractual relationship among the parties.

## IV. CONCLUSION

Defendants' partial motion to dismiss will be granted. The parties will be directed to advise the Court on their proposal(s) for how the case should proceed, if at all. An appropriate order follows.